**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

     Plaintiff,

        v.

CRUZ ROBERTO RAMOS-GONZALEZ, ET AL.,

     Defendants.

CRIMINAL NO. 07-318 (PG)

## OPINION AND ORDER

Before the Court are several motions for a new trial under Federal Rule of Criminal Procedure 33 filed by defendants Cruz Roberto Ramos-Gonzalez ("Ramos") (Docket No. 2125), Carlos Omar Bermudez-Torres ("Bermudez") (Docket Nos. 2276), and Sandra Flores-Rivera ("Sandra Flores") (2279), collectively referred to as "Defendants."[1]  Defendants ask for a new trial based on, primarily, a handwritten letter and two (2) handwritten notes from a cooperating co-defendant and Government witness.  The defendants allege that these handwritten documents, containing communications with the lead prosecutor and investigators in the case, are exculpatory as well as impeachment material that should have been turned over to the defense prior to trial, the failure of which merits a new trial.  In light of the evidentiary hearing held to address the alleged Brady violations, and after careful consideration of the parties' motions, responses, replies, and memoranda of law, the Court **DENIES** Defendants' request for a new trial.

---

[1] Co-defendant in the trial that is now the subject of the pending motions for a new trial, Sonia Flores-Rivera ("Sonia Flores") has not moved for a new trial herself or requested to join one of her co-defendant's motions.

### I. Factual and Procedural Background

### A. Pre-Evidentiary Hearing

On August 2, 2007, a Grand Jury returned an Indictment against forty-four (44) defendants for federal narcotics and firearms violations[2], arising from their participation in a large criminal drug conspiracy principally based in the Victor Berrios Public Housing Project in Yabucoa, Puerto Rico.  On February 5, 2008, a Grand Jury returned a Superseding Indictment adding two (2) defendants and additional charges against Ramos, the criminal drug organization's alleged ringleader, for tampering with a witness and obstruction of justice.[3]

A trial against defendants Ramos, Bermudez, Sonia Flores, and Sandra Flores-Rivera ("Sandra Flores") was held from October 13, 2009 to November 2, 2009.  On November 3, 2009, after approximately six and a half (6.5) hours of deliberation, the jury found Ramos and Bermudez guilty on all six (6) counts relating to charges of conspiring to distribute narcotic controlled substances within 1,000 feet of a school zone and public housing project, and of conspiring to possess firearms in furtherance of these drug trafficking crimes.  Defendants Sandra and Sonia Flores were also found guilty on the drug trafficking counts

---

[2] The defendants were charged with conspiracy to distribute controlled substances (heroin, crack cocaine, cocaine, marijuana) within one thousand (1,000) feet of public housing authority or of a public school, all in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), 846 and 860; aiding and abetting to possess firearms in furtherance of drug trafficking crimes, in violation of 21 U.S.C. §§ 924(c)(1)(A); and aiding and abetting in the distribution of narcotic controlled substances (heroin, crack cocaine, cocaine, marijuana, and prescription drugs), all in violation of 21 U.S.C. §§ 841(a)(1) and 860, as well as 18 U.S.C. § 2.

[3] Ramos was charged with conspiracy to tamper with a government witness; aiding and abetting in the tampering of the same witness; and aiding and abetting in the attempt to bribe the same witness, all in violation of 18 U.S.C. §§ 1512(b)(1) and (k) and 18 U.S.C. §§ 201(b)(3) and 2.

with which they were charged, that is, all but Count 2.  The remaining counts relating to the witness tampering charges are still pending trial.[4]

On March 9, 2010, the United States produced or made available to all defendants a handwritten letter from cooperating defendant Harry Smith Delgado-Cañuelas ("Delgado"), written at an unspecified time and date before the trial on the drug trafficking charges.  Said letter (Docket Nos. 2180-2, 2329-1) - two (2) photocopied pages of handwritten text addressed to prosecutor Dina Avila-Jimenez ("Avila") from "the best cooperator Harry S. Delgado" - reminds Avila of promises made by the Government regarding the relocation of his conjugal partner and children, their visiting rights, and the importance of protecting his family's whereabouts.  In closing, Delgado writes to Avila that the last time he saw her he promised "to do everything that you said and I have done it to the point that you know how this is we have more than we expected more evidence and more strength for the case I hope you can help me I will. . . ." (translation ours).  The rest of the handwritten text is omitted from the second page of the letter, the bottom of which was left blank.  It is unknown whether this was done intentionally or inadvertently.  It is also unknown whether there are additional pages missing from the letter.

On April 5, 2010, Ramos filed a motion for a new trial and a request for an evidentiary hearing (Docket No. 2125), arguing that the withholding of this letter from the defense prevented an effective cross-examination and impeachment of the Government's "star witness," therefore depriving Ramos of a fair trial to a degree sufficiently warranting a new trial.  In said motion, Ramos argued that the prosecutor's failure to disclose evidence that might have been used for impeachment contravened the Brady rule, see Brady v. Maryland, 373 U.S. 83 (1963).  He concluded:

---

[4] The Court bifurcated the witness tampering counts 7,8,9 from the drug counts 1-6.

Mr. Delgado-Cañuelas['] concealment of the true motives for cooperating with the government, and the benefits the government exchanged with him to achieve those objectives, critically crippled the Defendant's ability to effectively cross-examine this particular witness at trial; evidence was favorable to the Defendant for purposes of <u>Brady</u>; and was powerful enough to be prejudicial and provide the grounds for a new trial, particularly because it is highly impeaching and the witness' testimony is uncorroborated and was essential to the Defendant's conviction.

(Docket No. 2125 at 6.)

On April 14, 2010, the United States filed a response to Ramos' motion for a new trial (Docket No. 2180), agreeing to the holding of an evidentiary hearing, requesting that those defendants who were found guilty by the jury notify the Court of whether they intended to participate in it, and also requesting that Delgado testify at the hearing.  As Defendants opted not to subpoena or move that Delgado testify at the hearing, the Court did not order him to participate in the evidentiary hearing.

On May 17, 2010, Bermudez filed his own motion for a new trial and evidentiary hearing (Docket No. 2276).  In this motion, Bermudez attempts, first, to undermine Delgado by attacking his credibility and claiming that his and other government witness's trial testimony linking Bermudez to the criminal conspiracy was perjured.  Secondly, Bermudez adopts, realleges, and incorporates the arguments in Ramos' motion for a new trial.  Like Ramos, Bermudez submits that the letter "unequivocally shows that the government made promises to Mr. Delgado Cañuelas in exchange for his cooperation" and that the promises were withheld from the defendant, depriving Bermudez of a more effective cross examination of Delgado. (<u>Id.</u> at 9.)  Bermudez argues that any benefits provided for Delgado's partner and family such as probation or relocation, which could influence his trial testimony, should have been timely provided to the defendants for the use of cross examination and impeachment, citing <u>Giglio v. United States</u>, 405 U.S. 10 (1972).  Furthermore, Bermudez imputes bad faith to Avila for having knowledge of the exculpatory value of the evidence before she

even received the letter and at the time it was lost or destroyed, but failing to deliver it to the defense prior to trial.

In Bermudez' motion for a new trial, he also takes issue with the alterations of the original letter and the omission of the last lines of the second page of the letter. Bermudez submits a claim for destruction or loss of evidence under a three-pronged test, citing the Supreme Court's <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988) and <u>California v. Trombetta</u>, 467 U.S. 479 (1984), which require a showing of bad faith on the part of the Government, apparent exculpatory value assigned to the evidence, and the irreplaceability of the evidence. Finally, Bermudez argues that the withheld evidence was both <u>Jencks</u> and <u>Giglio</u> material under the Jencks Act, 18 U.S.C. § 3500(b), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Bermudez claims that he was entitled to discovery of Delgado's pretrial statements relating to his trial testimony under the Jencks Act, as well as to disclosure of promises or favors by the Government to its witnesses, in this case to a cooperating defendant, for the use of cross examination. Bermudez claims that he "had a due process and statutory right to use and confront Mr. Delgado Cañuelas with this letter and bring to the jury's attention these other promises and favors omitted by him on direct examination. . . ." (Docket No. 2276 at 15).

On May 19, 2010, defendant Sandra Flores filed a motion to join defendant Ramos' motion for a new trial (Docket No. 2279), requesting to join the arguments set forth by Ramos. On June 7, 2010, Ramos filed a motion to dismiss the Indictment for Prosecutorial Misconduct (Docket No. 2329), which will not be touched upon in this Opinion. Bermudez requested to join Ramos' motion to dismiss as well as his motion for a new trial (Docket No. 2330).

**B. June 8, 2010 Evidentiary Hearing**

On June 8, 2010, the Court held the evidentiary hearing to establish a thorough factual foundation surrounding Defendant's allegations of newly discovered exculpatory and impeachment evidence in violation of Brady and in order for the Court to rule on the pending motions for a new trial. At the hearing, prosecutor Avila was called as a witness by Defendants to testify as to her knowledge of Delgado's letter, its contents, wording, and omissions or alterations. She was asked about how she discovered the letter and when she disclosed it. She was also questioned as to nature of her conversations with Delgado, including any promises or benefits offered to him, predating as well as succeeding the disclosure of the letter. Defendants also confronted Avila with two (2) additional pieces of evidence that they alleged contained exculpatory and impeachment material. These were two (2) handwritten notes by Delgado of conversations he sustained with other co-defendants who were either cooperators or potential cooperators, in particular Andy Marcano-Alicea ("Marcano") and Gabriel Medina-Pabon ("Medina"), on the night of December 9, 2008. Delgado wrote these notes for use by Federal Bureau of Investigation (FBI) agents in the investigation of the witness tampering charges.

Avila testified that she discovered Delgado's letter inadvertently when she was preparing for the trial on Counts 7, 8, and 9, in a binder with material related to the witness tampering charges. According to Avila, once she found the letter, she asked the FBI agents to "go through each 1A folder or envelope to see if they could find the original to this letter" but that they could not find it. (Docket No. 2364 at 120-21.) She could not provide an explanation for any alteration or copying error as it was the agents who handled the original letter. Moreover, she affirmed that she never destroyed or ordered the destruction of any exculpatory or impeachment evidence in this case. Indeed, she proffered that it was her practice turn over such evidence unless it would risk the security or lives of cooperators or potential witnesses, and that it

was her practice as well to tell the agents to preserve all evidence until all appeals had been exhausted. (See id. at 86, 104-05, 121.)

The two (2) notes of Delgado's conversations with Marcano and Medina took place on the night of December 9, 2008, at 8:57 and 9:18 p.m. and concern, primarily, the willingness or ability of these and other co-defendants to cooperate with the Government and testify truthfully in the trial on the drug trafficking charges. These conversations, which shall be discussed more fully later in the Opinion, took place before trial through the "toilet system"[5] when Delgado was confined at Unit 4-C (otherwise known as "4 Charlie") at the Metropolitan Detention Center (MDC) in Guaynabo, Puerto Rico.  At the evidentiary hearing, Avila testified that although they were in her possession at one point, she could not remember the notes when she was carrying out her duty to disclose exculpatory evidence.  She stated that had she remembered or recalled the notes, she would have turned them over, as she would normally done and in an abundance of caution, even though she did not believe that she was required by law to disclose them. (See Docket No. 2364 at 61.)

Avila claims to have handed over (8) eight to nine (9) packages of potential Giglio and Jencks material and submitted that normally she would have included Delgado's writings in them had she remembered them in preparation of the trial on the drug trafficking charges. (See id. at 61.)  In response to the Court's questioning, Avila estimated that, between correctional records, prison records, notes, reports of investigation, toll records, and photographs, thousands of documents were involved in this case.[6] (Id. at 131.)  She averred

---

[5] At the time of Delgado's separation from the general prison population at 4-Charlie, it was a common practice for inmates to empty their toilets of water and speak to other inmates located below through the piping system.

[6] In response to questioning by Ramos' counsel, Avila specified that she delivered at least 2,000 pages worth of documents, as she remembered that Bermudez' counsel complained in a status conference about the 2,000 or more pages of discovery that the defense had received. (See Docket No. 2364 at 132.)

that her policy as to providing discovery to the defendants was to abide by standard Rule 16 discovery rules, that is, to provide the documents in advance of trial "as soon as" they came into her possession. (Id.)  More specifically, she estimated that she began handing over the Jencks material in July 2009 for August 2009, as the trial was originally scheduled, and that she had been providing Giglio and Kyles material since September 5, 2008, on an ongoing basis. (See id. at 131-32.)

If anything, the evidentiary hearing allowed the Court to gauge Avila's testimony as credible and supportive of her avowal of good faith in belatedly disclosing the evidence by reason of inadvertence.  The Court is empowered to make this preliminary finding because district courts are granted considerable deference and enjoy a "'broad power to weigh the evidence and assess the credibility of both the witnesses who testified at trial and those whose testimony constitutes 'new' evidence.'" United States v. Lenz, 577 F.3d 377, 380 (1st Cir. 2009) (quoting United States v. Falu-Gonzalez, 205 F.3d 436, 443 (1st Cir. 2000)).  While good faith is not essential to an analysis of new trial motions pursuant to Brady violations, as shall be discussed *infra*, at this juncture the Court can conclude that at no point did prosecutor Avila's explanations provide grounds for finding that she withheld the contested evidence in bad faith.

### C. Post-Evidentiary Hearing

On July 2, 2010, Ramos filed a post-hearing memorandum of law in support of his request for a new trial (Docket No. 2391), which was joined by Bermudez (Docket No. 2411).  In said motion, Ramos supplements his previous arguments in favor of the Court granting a new trial with Avila's testimony from the evidentiary hearing, adding that the notes of Delgado's conversations with

Marcano and Medina provide further exculpatory and impeachment material that justify their request for a new trial. Ramos fleshes out his <u>Brady</u> claim by arguing that the withheld evidence, when viewed collectively, undermines the confidence in the guilty verdict reached by the jury. This, he argues, is because there was no physical evidence against Ramos, only the testimony of key witnesses like Delgado and Marcano linking him to the drug conspiracy. The defense, he alleges, was only armed with Delgado's testimony that he would cooperate with the prosecution because he expected a sentencing recommendation from the Government, and was therefore denied the opportunity to "pursue its line of questioning as to the incentives or benefits [Delgado] expected to receive in exchange for his testimony at trial." (Docket No. 2391 at 12.) Thus, Ramos says he was unable "to pursue an effective cross examination as [to Delgado's] motives to cooperate and testify for the government." (<u>Id.</u>) The withheld evidence "would have supported the allegation at the time of trial that the defendant was biased in favor of the federal government." (<u>Id.</u>) Not just to show bias, but Ramos adds that he could have cross-examined Delgado to support the theory that he spoke with co-defendants at prison "to recruit them, and coordinate their respective testimonies to avoid any inconsistencies at trial." (<u>Id.</u> at 13.) In essence, Ramos argues that the letter and notes would have afforded him an outcome-determinative opportunity to impeach Delgado and prove that he perjured himself on the stand.

On July 19, 2010, the Government responded to the defendants' numerous motions related to their request for a new trial (Docket No. 2414). In its "Omnibus Reponse" the Government posits that the pieces of evidence cited by the defendants in support of their new trial request were withheld inadvertently and were disclosed promptly after they were found by Avila during the preparation for trial on the witness tampering charges; moreover the Government claims that they were immaterial. The Government concludes that:

> [it] possessed the letter and the December 9, 2008 notes before trial was
> held. The United States also acknowledges that it would have provided all
> three documents prior to trial as it is the practice of this prosecutor
> to do. However, the United States [sic] failure to turn over said
> documents was unintentional and not in bad faith, as it is clearly
> reflected by the extensive amount of potential <u>Jencks</u> and/or potential
> <u>Giglio</u> that was produced in this case.

(Docket No. 2414-1 at 39.) Moreover, the Government submits that the contents

of the documents were immaterial and therefore "their absence could not

undermine confidence in the verdict." (<u>Id.</u>) The contested evidence was

immaterial to the outcome of the case, argues the Government, because it would

have been cumulative or collateral and insufficient to establish any prejudice

under <u>Brady</u>. Their impeachment value would have been minimal, so argues the

Government, because deviations in Delgado's or other cooperating defendants'

testimonies were negligible. The Government affirms that Delgado, Marcano, and

the other co-defendants whose testimonies the defense attempts to undermine,

were extensively cross-examined as to the very subjects that the defense points

to as newly discovered evidence, in particular, the benefits and promises

afforded Delgado as part of his agreement to cooperate.

     Finally, the Government concludes that substantial corroborating evidence

supports Defendants' guilty verdicts. The testimonies of Delgado, Marcano, and

others, argues the prosecution, were corroborated by other evidence including

audio and video recordings, drug ledgers, testimony by police officers who

conducted the arrests.

     On August 13, 2010, Ramos filed a reply to the Government's omnibus

response (Docket No. 2438-1). In said reply, Ramos takes issue with the

Government's legal arguments, distinguishing the cases cited in support thereof.

Ramos repeats and expands upon his previous arguments that the withheld evidence

violated <u>Brady</u> and would have supported the exculpatory theory that Delgado was

testifying in favor of the Government in exchange for promises and that he

actively recruited other co-defendants in prison to cooperate and conform their

testimonies.   Ramos  reiterates  that  the  December  9,  2008  notes  clearly
illustrate that Delgado perjured himself and was an untrustworthy witness whose
testimony  could  have  been  more  effectively  impeached  to  a  degree  warranting  a
new trial.

Finally,  in  his  reply,  Ramos  cites  to  a  fourth  piece  of  evidence  as
material  and  exculpatory  for  Brady  purposes,  alleged  to  have  been  first
discovered  as  an  attached  exhibit  to  the  Government's  omnibus  response:  an  FBI
302 report of investigation dated September 5, 2007 containing an interview in
which  Delgado  describes  how  he  first  met  Ramos  and  what  he  knew  about  the
different  actors  and  their  roles  in  the  drug  conspiracy.   (Docket  No.  2414-16).
According to Ramos, "to the best of [counsel's] knowledge, this specific FBI 302
was  never  provided,  and  if  it  was  it  was  redacted  in  a  manner  in  which  the  full
text  of  the  FBI  302  was  never  disclosed  to  the  appearing  defendant  until  the
recent  filing  of  the  government's  omnibus  response."  (Docket  No.  2438-1.)   Ramos
claims  that  the  FBI  302  report  contains  exculpatory  material  in  the  form  of
statements  by  Delgado  which  could  have  been  impeached  by  calling  a  new  witness
to  the  stand  who  would  have  contradicted  his  testimony  about  how  and  when
Delgado  first  met  Ramos.   According  to  Ramos,  the  allegedly  undisclosed  302
report  would  have  also  shown  that  Delgado  perjured  himself  when  he  testified
about  the  number  of  drug  points  and  roles  played  by  the  different  operators  of
those points at the Victor Berrios public housing project.

Having  carefully  examined  Defendants  and  the  Government's  positions,  the
Court is now ready to rule.

**II. Standard of Review**

       **A. Motion for a New Trial**

Federal Rule of Criminal Procedure 33 provides that upon a defendant's motion, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "'The remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result.'" United States v. Del-Valle, 566 F.3d 31, 38 (1st Cir. 2009) (quoting United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001)). As the Court can discern, Defendant's motions are premised upon newly discovered evidence – primarily Delgado's letter to Avila and his notes of prison-talk – and therefore must be analyzed under the law governing such claims.[7] However, Defendants cabin their claim of newly discovered evidence under Brady and related cases holding that the prosecutor's failure to disclose exculpatory evidence warrants a new trial. "Slightly different standards apply to these two claims, but both require the defendant to show some degree of prejudice." Id.

### 1. Newly Discovered Evidence

A defendant who seeks a new trial on the basis of newly discovered evidence bears a "weighty burden" of establishing that: (1) the evidence was unknown or unavailable to the defendant at the time of the trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendants; (3) the evidence is material and not merely cumulative or impeaching; and (4) the emergence of the evidence will probably result in an acquittal upon retrial of the defendant. Id. (citations omitted). If the defendant fails to meet any one of these factors, the new trial motion "must be denied." Id. (citing United

---

[7] Other arguments for a new trial under Rule 33 must fail for untimeliness because only motions premised upon newly discovered evidence can be filed within three (3) years after the verdict, while those "grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." FED. R. CRIM. P. 33(b)(2). In this case, the jury returned guilty verdicts on November 3, 2009, and the defendants filed their motions for a new trial on April 5, 2010, that is, five months after. See generally 39 GEO. L. J. ANN. REV. CRIM. PROC. 854-55 (2010).

States v. Gonzalez-Gonzalez, 258 F.3d 16, 20 (1st Cir. 2001)).  "A showing of prejudice under the fourth prong of the test requires an 'actual probability that an acquittal would have resulted if the evidence had been available.'" Id. (quoting Gonzalez-Gonzalez, 258 F.3d at 20).  This is a difficult prong to meet especially where there is a substantial amount of other evidence supporting the moving defendant's conviction.

### 2. Newly Discovered Evidence Due to Alleged **Brady** Violations

Different standards as to the third and fourth prongs govern the consideration of a new trial motion if the government has failed to disclose information required by Brady.  When such is the case, as it is here, a more "defendant-friendly" standard applies whereby the defendant must show a "reasonable probability" - not actual probability - that had the evidence been disclosed to the defense the result of the proceeding would have been different. Gonzalez-Gonzalez, 258 F.3d at 20 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995).[8]  In other words, the Court must ask whether the trial resulted, in the absence of such evidence, in "a verdict worthy of confidence." Id. (citing Whitley, 415 U.S. at 434).  Although phrased differently, the same standards apply to motions submitting that the government knowingly offered perjured testimony to obtain a defendant's conviction. See id. at 22 (articulated as a "reasonable likelihood that the false testimony could have affected the judgment of the jury.")

For claims premised upon Brady violations, the defendant must establish that: (1) the evidence at issue is material and favorable to the accused; (2)

---

[8] As the First Circuit has observed, because the standard applied to new trial motions based on Brady violations is less onerous and thus easier for defendants to satisfy, "defendants have an incentive to 'try to shoehorn as much of the new evidence into the Brady category as possible." United States v. Maldonado-Rivera, 489 F.3d 60, 66 (1st Cir. 2007).

the evidence was suppressed by the prosecution; and (3) the defendant was prejudiced by the suppression in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Del-Valle, 566 F.3d at 40 (citing Conley, 249 F.3d at 45; United States v. Rivera-Rangel, 396 F.3d 476, 485 (1st Cir. 2005)); see also United States v. Connolly, 504 F.3d 206, 212 (1st Cir. 2007) (describing the second prong as evidence "either willfully or inadvertently suppressed" by the government).  The requirement that the withheld evidence be material is "not met by the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial" but rather the exculpatory material must be of such probative value that there is a reasonable probability that the evidence would have changed the result. See United States v. Garcia-Torres, 341 F.3d 61, 70 (1st Cir. 2003) (citations and internal quotation marks omitted). Brady prohibits the suppression of evidence favorable to the accused where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution, but it "'did not create a general constitutional right to discovery in a criminal case.'" United States v. Celestin, 612 F.3d 14, 22 (1st Cir. 2010) (quoting United States v. DeCologero, 530 F.3d 36, 64 (1st Cir. 2008)).

As for new trial claims based on the impeachment value of the withheld evidence, only undisclosed impeachment evidence that suffices to undermine confidence in the outcome of the trial may carry the day. See Connolly, 504 F.3d at 213 (citing United States v. Bagley, 473 U.S. 667, 682 (1985); United States v. Dumas, 207 F.3d 11, 16 (1st Cir. 2000) ([I]mpeachment evidence, if powerful enough, could constitute grounds for a new trial. . . .") "Wrongly withheld impeachment evidence can merit a new trial when 'the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction.'" United States v. Garcia-Torres, 341 F.3d 61, 70 (1st Cir. 2003).

The force of impeachment evidence, however, is diminished when the witness's testimony is supported by substantial corroborating evidence or when the impeachment evidence is cumulative or collateral. See Conolly, 504 F.3d at 217 n.6 (citing Gonzalez v. Gonzalez, 258 F.2d at 22-23; United States v. Sanchez, 917 F.2d 607, 619 (1st Cir. 1990); see also Garcia-Torres, 341 F.3d at 70 (1st Cir. 2003) ("However, 'impeachment evidence that is merely cumulative or collateral is insufficient to establish prejudice under Brady.'") Generally, a Brady-based motion for a new trial should be denied if, even had the withheld evidence been presented, there were "ample grounds on which the jury could have convicted [the defendant]." See Del Valle, 566 F.3d at 41 (citing Rivera-Rangel, 396 F.3d at 486).


## III. Discussion


The Court finds that, even under the more defendant-friendly standard applicable to new trial motions supported by Brady violations, Defendants have not raised any reasonable probability that, had the Government disclosed either Delgado's letter, December 9, 2008 notes of conversations, or September 5, 2007 FBI 302 report, the result of the trial would have been different to a degree that undermines confidence in the guilty verdicts reached by the jury. The evidence supporting Defendants' arguments are principally aimed at impeaching Delgado's credibility and bias in favor of the Government, issues that were already opened at trial and closed shut by the jury. None of the newly discovered evidence with which Delgado could have been more severely impeached would have raised a reasonable probability of acquittal. Beyond the smokescreen of factual allegations attacking Delgado's credibility, which were in large part previously decided by the jury, Defendants have not pointed to a single piece

of material evidence that undermines the guilty verdicts, especially when substantial evidence corroborates their participation in the drug trafficking conspiracy.  The Court explains.

### A. Delgado's Letter to Avila

The common theme of Defendants' numerous motions is the attempt to re-open the issue of Delgado's credibility, offering alternative theories for why Defendants were prevented from more effectively discrediting Delgado's trial testimony, alleged to have been essential and uncorroborated as to Defendants' guilt.  However, as the Government pointed out, the defense "had in its possession the potential benefits and impeachment information at the time they cross-examined [Delgado] as can clearly be seen from Exhibits A through I attached to [the] response." (Docket No. 2414-1 at 22.)  The defense

> could have easily cross-examined [Delgado] as to the relocation of his family, as to the amount of money expended to relocate them, as to the monies that were deposited in his commissary account, as to the times he was permitted to smoke or call his family, and as to so many other things that were disclosed to the defense between August 2007 and October 13, 2009.

(Id.)  At the evidentiary hearing, Avila testified that contrary to Defendants' claims, she did provide Defendants with the information concerning the benefits afforded to Delgado by the Government, particularly through a discovery letter dated August 3, 2009, that disclosed the amount of money transferred to his conjugal partner and his family as well as efforts made to relocate them outside of Puerto Rico. (Docket No. 2364 at 125-30 & Exhibit 3.)  At the evidentiary hearing and during her cross-examination of Avila, counsel for Sandra Flores even admitted that Defendants had received this information, objecting to Avila's testimony regarding the discovery letters by stating: "We object. What is the purpose? We all know she provided that. It's part of the record at trial,

that Giglio was presented at trial in direct and cross-examination. I don't see the purpose of overstating what is already in the record." (Docket No. 2364 at 127.)

Defendants are left with the sole claim that Delgado's partner's probationary status was not disclosed to the defense. The Court, however, fails to see how the fact of his partner's probation and his plea for her protection would have been a material piece of evidence for the defense that undermines confidence in the verdict. Delgado's prior criminal history was thoroughly disclosed prior to trial and cross-examined at trial, therefore, his partner's own criminal conduct would not introduce any new material evidence that would cause a jury to discredit Delgado's testimony any more than they already had. Any offer of help to accommodate Delgado's concerns about his partner's probationary status and her visitation and custody rights fall into the same general category of legitimate benefits that were in large measure disclosed in the numerous Brady and Giglio packages submitted by the prosecution to the defense. One incident of inadvertent non-disclosure of an immaterial fact out of the thousands of documents that were turned over to the defense cannot raise a reasonable probability of acquittal.

The August 3, 2009 discovery letter provided Defendants with the many benefits afforded to Delgado, which in turn was a plentiful source of impeachment material. For example, the defense received a video recording of Delgado sending a message to his partner and daughters, entered into evidence at trial; notes written by Delgado outlining Defendant's roles in the conspiracy; and the fact that free boarding was provided by a case agent to Delgado's partner, even though he did not know the apartment belonged to the agent. The Government's numerous exhibits attached to its omnibus response reflect a pattern of disclosing all potentially exculpatory and impeachment evidence relating to Delgado (see, e.g., Docket No. 2414 Exhibit C, D, G, H.)

The Court adds that not only were Defendants armed with abundant discovery regarding Delgado's character, prior criminal records, notes written while in prison, and most importantly, benefits provided as a cooperator, Defendants had the opportunity to extensively cross-examine Delgado at trial on all of these subjects. Delgado was on the stand for direct examination on October 19, 2009, and for cross-examination on October 20 to 21, 2009. On October 19, 2009, for instance, Delgado was asked by prosecutor Avila on direct whether he was ever paid for cooperating with the FBI and he answered "yes" and "somewhere between nine or $10,000" by the FBI, adding that there was a "payment process" by which he would sign, the money was given to his family because the "family was protected," and from there the family would post money into his commissary. (Docket No. 1583 at 14.) Defendants chose not to cross-examine Delgado on the money transfers provided to Delgado and his family to protect him for his cooperation. The Court even gave jury instructions warning the jury that Delgado had received monetary benefits from the Government which could affect the truth of his testimony and should be considered in judging his credibility as a Government witness. (Docket No. 1681 at 13.)

Given that the contents of Delgado's letter to Avila, though written in hyperbole, largely address promises and benefits afforded to Delgado that were already disclosed prior to trial, Defendants are left with impugning the Government's motives in withholding the letter and failing to preserve an unadulterated original. In essence, they make a mountain out of a mole-hill. Defendants suggest that Delgado was afforded even greater promises that were and remain undisclosed, in spite of Avila's testimony at the evidentiary hearing clarifying what Delgado's words meant: what he was asked to do by the Government (to tell the truth and influence other co-defendants to tell the truth, according to Avila); what he requested of them in return (promises to protect his partner and family); and what he meant by "we have more evidence and more

Civil No. 07-318(PG)                                                        Page 19

strength for the case" (the possession of more physical evidence such as recordings proving Defendants' guilt). Defendants also raise the suggestion of impropriety in spite of their opportunity to call Delgado to the stand and cross-examine him, under penalty of perjury, as to the meaning of his words, as he is the mind and author behind them.

Defendants are left with a claim for lost or destroyed evidence under the Supreme Court's seminal cases <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988) and <u>California v. Trombetta</u>, 467 U.S. 479 (1984), as argued by Bermudez in his motion for a new trial. Under the First Circuit test, where the government no longer possesses the disputed evidence, the defendant must show that, in failing to preserve the evidence, the government: (1) acted in bad faith when it destroyed evidence, which (2) possessed an apparent exculpatory value and which (3) is to some extent irreplaceable. <u>United States v. Dumas</u>, 207 F.3d 11, 15 (1st Cir. 2000). As the Court previously found, however, there is no evidence that the Government acted in bad faith, or that it even destroyed evidence as opposed to miscopying a single handwritten page by photocopy error. The evidentiary hearing allowed the Court to gauge the prosecutor's motives and credibility, all of which reflect good faith on her behalf. The defense did not raise any doubt as to the prosecutor or the FBI's intentions regarding the miscopied page(s), other than that which is based on inference and speculation. Defendants did not call the case agents to the stand to question the completeness of the letter. Moreover, the letter is cumulative and collateral, and therefore, possesses no apparent exculpatory matter. Defendants have also failed to show that the letter is irreplaceable even though only parts of it are missing and the general content touches upon previously disclosed <u>Giglio</u> matter.

In conclusion, Delgado's letter only arms Defendants with cumulative or collateral impeachment evidence aimed at discrediting Delgado for his motives for testifying in favor of the Government, which were largely disclosed prior

to trial and were subject to extensive direct and cross-examination at trial. "Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral." Dumas, 207 F.3d at 16. Defendants grasp onto this one letter with admittedly hyperbolic and expressive language to request another bite at the apple, even though when the contents are stripped to their bare essentials, they say nothing more than what has already been said about Delgado at trial, and even though the amount of discovery turned over to the defense numbered in the thousands. Furthermore, Defendants belated attempt to raise new theories surrounding the efforts of a government witness to recruit other co-defendants and harmonize their testimonies at trial, due to a bias which has already been attacked at trial, must also fail. Delgado's motives, biases, and credibility was already decided by the jury and additional impeachment attempts can only be described as cumulative.

### B. December 9, 2008 Notes of Prison Conversations

Similarly, attacking Delgado's prison conversations with co-defendants Marcano and Medina to show perjury falls into the same general category of cumulative or collateral impeachment evidence failing to create a reasonable probability of acquittal. Defendants cite to testimony at trial wherein Marcano and Delgado deny talking about the facts of the case to show that he perjured himself by talking to Marcano, Medina, and a third cooperating co-defendant Xiomarra Berrios ("Berrios") about their roles in the conspiracy and whether to cooperate with the prosecution. Defendants also submit that Marcano committed perjury for the same reason: denying talking about the facts of the case while

engaging in conversations through the MDC's toilet system that "clearly related to the drug trafficking charges."

In the 8:57 p.m. notes, Delgado writes that Medina said "look [Delgado] I'm calling you to tell you I'm cooperating in the case with the prosecutor and

I know you are preparing [Berrios]" to which Delgado responded "You're mistaken because I want [Berrios] to snitch and she doesn't want to." (Docket No. 2364 & Exhibit B; 2414-13 at 5.)  Delgado then writes that Medina asked Delgado why the Government had charged him with being an enforcer and selling at a certain drug point, in an attempt to exculpate himself, and Delgado responds "you know very well that you sold [drugs] with me . . . and I'm telling the truth" and concludes:

> Look [Medina] I can't trust you until you come up here [to 4-Charlie], I'm going to give you advice as a man and not as a friend because you know that you and I are not friends if you really want to snitch do it now because the trial is soon and . . . [illegible] . . . they will pay because I am going to tell the truth and tomorrow I'm calling the FBI agents and I will ask them if you are really cooperating.

(Id.) (translation ours).

In the 9:18 p.m. notes, Marcano tells Delgado that he is "not denying any participation in all of this" and that he wants for them to "help each other out" and "not be enemies, just friends" when Marcano arrives at 4-Charlie as a cooperator. (Docket No. 2364 & Exhibit C; 2414-13 at 1.)  Marcano then states that he is "going to cooperate" because "those people are pigs, they tried to kill me because I know a lot." (Id.)  Delgado responds: "you know I am not your enemy I only told the truth and I am searching for God and I will tell the truth." (Docket No. 2414-13 at 2.)

As the Government correctly stated, the contents of these conversations are not exculpatory as to any of the guilty Defendants.  They simply reflect conversations by two co-defendants who were either contemplating cooperating or

already decided upon cooperating with the Government.  In essence, Marcano and
Medina are attempting to exculpate themselves, not Defendants, from playing
major roles in the drug conspiracy, and are attempting to curry favor with
Delgado, not vice-versa, such that he would treat them fairly when they would
arrive and reside together at the cooperator's unit 4-Charlie.   In fact,
Delgado's statements denying that he was "preparing" Berrios and that he wanted
her to cooperate but she was refusing to do so undermine any suggestion that he
was coaxing any of the three co-defendants into cooperating and conforming their
testimonies.  In Berrios' cross-examination at trial, she was specifically asked
by counsel for Ramos if Delgado "was one of the people who convinced you to
cooperate; isn't that correct" to which she responded "no." (Docket No. 1606 at
126-127.)   The conversations rather reflect apprehension about Marcano and
Medina's statements regarding their roles in the conspiracy and indeed only
demonstrate Delgado's commitment to tell the truth as he saw it and as the jury
was able to question in spite of his poor judgment and prior bad acts.

        Yet, Defendants point to Delgado and Marcano's trial testimony to show
perjury.  Specifically, on the fifth day of trial during cross-examination,
Delgado is quoted as saying that he did not discuss his participation in the
heroin business with Marcano because "that is not talked about." (Docket No.
1588 at 111.)  He was asked if "during the last several months that [Marcano]
has been there [living at 4-Charlie], you never talked to him about the facts
of the case?" (Id.)  He responded: "No because when I found out that he was
going to go there, I, from the beginning, when I arrived there in 2007,  the
order is that you cannot talk about the cases with anybody, anybody, nobody,
nobody." (Id.)  On the eleventh day of trial, Marcano is asked: "Did you at any
time discuss your testimony or the facts of this case with Harry Delgado?"
(Docket No. 1615 at 35.)  Marcano responded: "No. It is totally prohibited to
us to talk about the case." (Id.)

Defendants argue that because they did not know that Delgado, Marcano, and by inference Berrios spoke at prison about the above-mentioned subjects that "clearly related" to the drug trafficking charges, they were deprived of the opportunity to impeach the cooperators for denying ever speaking about the facts of cases, which should be deemed perjury both on the cooperators' and the prosecutor's behalf. The Court, however, fails to see how the conversations were clearly related to the drug trafficking charges in the sense that the cooperators were discussing any key material factual allegations relating to either Ramos, Bermudez, Sonia Flores, or Sandra Flores' participation in the conspiracy and guilt. As the Court observed, these conversations are two (2) notes of many that were properly disclosed without incident and that summarize statements blurted out by other cooperators in an attempt to exculpate themselves from the conspiracy. Both notes and their impeachment value can only be described as limited and collateral as, whether the jury is led to believe that the cooperators lied about whether they talked about the case in prison, would not go to the heart of Defendants' participation or guilt in the drug trafficking conspiracy. The evidence of perjury is "weak" when it depends on the credibility of accused felons. See Gonzalez-Gonzalez, 258 F.3d at 23. Moreover, it is debatable whether these handwritten notes by Delgado about what Marcano, Medina, and Berrios were saying in prison could be used to impeach them at trial because they contain hearsay statements which are generally not admissible unless a foundation is laid and they are assented to or adopted. See Fed. R. Evid. 802-04. Once the evidence is deemed admissible, then Defendants can generally impeach the out of court declarants with prior inconsistent statements under Rule 806.

The attempt to show perjury on the cooperators' behalf is subject to the same requirement that such perjury raises a reasonable probability of acquittal, or differently stated, a "reasonable likelihood that the false testimony could

have affected the judgment of the jury." <u>Gonzalez-Gonzalez</u>, 258 F.3d at 22.

First, the Court surmises that any inconsistences in the cooperators' trial

testimony are limited and allegations of perjury are severely circumscribed by

the context of their prison conversations, for, they were mainly concerned about

whether or not to cooperate and how they would interact with Delgado, who viewed

them with apprehension.  They were not speaking about what Ramos, Bermudez, or

the Flores sisters did and said or whether they were guilty of trafficking.

Secondly, even assuming the cooperators lied about speaking to each other about

the facts of the drug trafficking charges, this would not raise a reasonable

likelihood that the jury's judgment would be affected because the contents of

the conversations were collateral or cumulative.  They were collateral because

they do not exculpate Defendants in any way, and, they were cumulative because

the fact that the cooperators spoke in prison either through the toilet system

or at 4-Charlie was subject to extensive cross-examination at trial.  Moreover,

the conversations do not support Defendants' own argument that Delgado was

recruiting cooperators to harmonize their testimonies; in fact, they undermine

such a theory.

Finally, the Court must briefly dismiss Defendants' last-ditch effort at

bringing in a fourth piece of evidence as alleged exculpatory <u>Brady</u> material:

the September 5, 2007 FBI 302 report.  Once again, Defendants attempt to reopen

the door of Delgado's credibility in order to discredit him and hypothetically

shake the jury's credibility findings, must fail as cumulative impeachment

evidence.  As a preliminary matter, the Court observes that Defendants' claim

that "to the best of our knowledge" they were never provided with a copy of this

FBI 302 report "and that if it was it was redacted in a manner in which the full

text of the FBI 302 was never disclosed until the recent filing of the

government's omnibus response" does not give the Court any assurance that the

very report which they claim was withheld in violation of <u>Brady</u> was ever really

withheld in the first place.  As evident in the Government's many discovery letters, <u>Brady</u>, <u>Giglio</u>, and <u>Jencks</u> packages, FBI 302 reports were generally turned over when they contained exculpatory matter and did not sacrifice the safety of any witness.  The Government also turned frequently over several FBI 302 reports for in camera inspection, as they did at the evidentiary hearing, such that the Court could rule on whether they contained exculpatory material. Most importantly, the contents of the 302 report were already the subject of cross-examination at trial, particularly as to Delgado's testimony of how he first met Ramos contradicted by the testimony of defense witness Ronald Cordero Caballero, the director of the Puerto Rico correctional penal records. (<u>See</u> Docket No. 1690 at 15.)  Defendants now want to strike again at Delgado's testimony by introducing new evidence by Carlos A. Cotto-Rivera, a "witness to rebut and totally discredit the testimony of [Delgado]." (Docket No. 2438-1 at 20.)  This witness would have testified as to the same or substantially the same topic of  how Delgado never met Ramos in Bayamon Prison 308 and that he lied as to his knowledge of Ramos.  This, as other evidence of Delgado's credibility, is merely cumulative impeachment evidence.  The same observation applies for his testimony as to the roles of the different operators of the drug points at the Victor Berrios public housing project and any alleged inconsistencies in the number of drug points and the roles of the mayor players involved.


       **IV. Conclusion**


     The ultimate question that the Court must ask when faced with <u>Brady</u> allegations in a motion for a new trial that involve undisclosed benefits given to a cooperator is whether "there is a reasonable probability that the jury, had it known the true extent and earlier date of [Delgado's] cooperation with the

government, would have reached a different verdict." <u>Gonzalez-Gonzalez</u>, 258 F.3d at 24. In <u>Gonzalez-Gonzalez</u>, the cooperating defendant was thoroughly examined as to his cooperation with the prosecutors and his credibility was impeached by questioning about his expectations of lenient treatment. <u>See</u> <u>id.</u> at 25. As in <u>Gonzalez-Gonzalez</u>, the cooperating defendants here were also thoroughly examined as to their cooperation with the government and were subject to questioning aiming at their impeachment. There, as in this case, the undisclosed evidence was cumulative. Though the letter and notes of prison conversations should have been turned over to Defendants, that fact that they were not did not deprive Defendants of a fair trial understood as a trial resulting in a verdict worthy of confidence. As the Supreme Court has stated, a new trial is not automatically required "whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." <u>Bagley</u>, 473 U.S. 667, 682 (1985). "The Constitution is not violated  every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-37 (1995).

For the reasons explained above, the Court **DENIES** Defendants' motions for a new trial (Docket Nos. 2125, 2276, and 2279).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, October 8, 2010.

<u>S/ JUAN M. PÉREZ-GIMÉNEZ</u>
JUAN M. PÉREZ-GIMÉNEZ
UNITED STATES DISTRICT JUDGE